1

2

3

4

5

6

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

7   RUIZ FOOD PRODUCTS, INC.,          )          CASE NO. 1: 11-cv-00889-BAM
                                       )
8                    Plaintiff,        )
                                       )          **ORDER ON THE PARTIES' CROSS-**
9   v.                                 )          **MOTIONS FOR SUMMARY JUDGMENT**
                                       )
10                                     )
                                       )
11  CATLIN UNDERWRITING U.S.,          )
    INC., *et al.,*                    )
12                                     )
                     Defendants.       )
13  _____ )

14

15

16

17                          **I.    INTRODUCTION**

18          Plaintiff Ruiz Food Products, Inc. ("Ruiz") proceeds with this action against Catlin

19   Syndicated Limited, sued as Certain Underwriters at Lloyd's of London ("Catlin") as a result of

20   Catlin's denial of Ruiz' insurance claim.  Currently pending before the Court are the cross-

21   motions for summary judgment of Ruiz and Catlin regarding the issue of coverage.  (Doc. 94,

22   95.)  The parties filed opposition briefs[1] on August 17, 2012  (Doc. 101, 106), and Reply briefs

23   _____

24          [1] Catlin has objected to the relevance of various exhibits offered by Ruiz in support of their motion for
     summary judgment.  (Doc. 103, 111.)  The Court overrules these objections.  The exhibits offered by Ruiz are
25   relevant under Fed. R. Evid. 401, 402.  Catlin has also requested the Court take judicial notice of various publically
     available records, such as docket entries in this case or documents issued by the FDA or USDA.  (Doc. 98, 104.)
26   The Court may take judicial notice of any fact which is "... not subject to reasonable dispute in that it is either (1)
     generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination
27   by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; see also *MGIC Indem.*

28                                          1

1   on August 24, 2012.  (Doc. 109, 113.)  The Court heard oral arguments on September 7, 2012.

2   (Doc. 116.)  Counsel Richard Crossman and Michael Renberg appeared for Ruiz, and counsel

3   Linda Hsu appeared for Catlin.  *Id.*  Having considered the moving, opposition and reply papers,

4   the declarations and exhibits attached thereto, arguments presented at the April 27, 2012 hearing,

5   as well as the Court's file, the Court issues the following order.

6                    **II.    FACTUAL BACKGROUND**

7   **A.    Structure of Ruiz' Relevant Business Operations**

8           Ruiz produces frozen Mexican food products for distribution to retail customers.  (Ruiz'

9   Statement of Undisputed Facts "RSUF" No. 1, Doc. 94 Attach. 3.)  One of these Ruiz products is

10  Ranchero Beef and Cheese Tornados, a ready to eat product similar to burritos ("Tornados").

11  (RSUF No. 4.)  One of the ingredients incorporated into Tornados is a beef spice mix produced

12  by Superior Quality Foods, Inc. ("Superior").  (RSUF No. 2.)   The beef spice mix contains

13  hydrolyzed vegetable protein ("HVP") which is manufactured by Basic Food Flavors ("Basic").

14  (RSUF No. 3.)

15  **B.    Salmonella Contamination And Recall of HVP Products**

16          The U.S. Department of Agriculture ("USDA") has jurisdiction over Ruiz' frozen

17  Mexican food products, including Tornados.  (RSUF No. 14.)  Under USDA regulations, when a

18  product is suspected of being "adulterated," the recall committee of the Food Safety Investigation

19  Services ("FSIS") investigates the matter.  (RSUF No. 15.)  The definition of an "adulterated"

20  product inquires "if it bears or contains any poisonous or deleterious substance which may render

21  it injurious to health."  (RSUF 16.)

22          Beginning in January of 2010, the FDA undertook several inspections of the Basic

23  production facility.  Environmental samples collected from the Basic facility near the food

24

25  _____

    *Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986) (Court may take judicial notice of official records and reports).
26  The subjects of Catlin's request for judicial notice constitute official records capable of accurate and ready
    determination by resort to sources whose accuracy cannot reasonably be questioned. As such, this Court GRANTS
27  Catlin's request for judicial notice.

28                                    2

processing equipment tested positive for Salmonella on January 21, 2010, February 8, 2010 and February 18, 2010. (Ruiz' Exhibit C, Doc. 94, Attach. 2: 43-46.) On February 19, 2010, a sample from a finished lot of HVP tested positive for Salmonella. *Id.* Basic continued to manufacture the HVP under the contaminated conditions until February 20, 2010. *Id.* Basic issued a Class One recall on February 25, 2010 for all HVP products manufactured on or after September 17, 2009. (RSUF No. 9.)  A Class One recall is defined as being issued when products have "reasonable probability that the use of the product will cause serious, adverse health consequences."

A different lot of HVP subject to the recall was sent to Superior and used as an ingredient in its beef spice mix. (Catlin's Statement of Undisputed Facts "CSUF," No. 9.) Basic retained samples of that particular lot of HVP and had those samples tested for Salmonella contamination.[2] *Id.* The testing on the lot of HVP sent to Superior was negative for Salmonella contamination. *Id.* Superior conducted its own testing on lots of recalled beef spice mix on November 24, 2009, December 1, 2009 and December 7, 2009. The results of these tests came back negative for Salmonella contamination. (CSUF No. 11; Ex. 11, Doc. 99.)

Only one lot of Basic's HVP tested positive for Salmonella, and that particular lot was not sent to Superior, and thus, did not reach Ruiz. (CSUF No. 7-8.) Nonetheless, due to Basic's recall of its HVP products, Superior issued a recall of its beef spice mix on March 1, 2010. (Ruiz' Exhibit D, Doc. 94, Attach. 2: 47-50.) Following receipt of Superior's recall notice, on March 6, 2010, Ruiz placed on "hold" its Tornado products. (CSFU No. 12.) Ruiz tested samples of its Tornado product on December 23, 2009, January 23, 2010, January 28, 2010, January 30, 2010, January 31, 2010, and February 1, 2010. Each of those tests were negative for Salmonella. (CSFU No. 14.; Ex. 14, Doc. 99.) No Salmonella was ever found in a Tornado product.

On March 4, 2010, the FDA announced Basic's recall of HVP products due to Salmonella

---

[2] It is unclear when this different lot of HVP was produced or when Salmonella testing was conducted.

1   contamination, and "advis[ed] industry that the recalled bulk HVP product should be destroyed

2   or reconditioned according to FDA-approved procedures."  (Ruiz' Exhibit E, Doc. 94, Attach. 2:

3   51-53.)   On March 6, 2010, Ruiz contacted the FSIS after receiving notice of the HVP recall.

4   (RSUF No. 18.)  Ruiz attempted to avoid a recall because the HVP constituted only .0007% of its

5   Tornado product, and sample testing for Salmonella contamination was negative.  (RSUF No.

6   19.)  The recall committee of the FSIS found that Tornados needed to be recalled because they

7   had incorporated HVP from Basic that was subject to the FDA recall.  (RSUF No. 20.)  On

8   March 9, 2010, Ruiz recalled its Tornado products containing HVP manufactured after

9   September, 2009, and the FSIS issued a news release concerning Ruiz' Class One recall of its

10   Tornado products due to potential Ssalmonella contamination.  (Ruiz' Exhibit F, Doc. 94,

11   Attach. 2: 54-57.)

12   **C.   Ruiz' Accidental Contamination Policy With Catlin**

13          In October of 2009, Catlin issue to Ruiz a Product Contamination Policy (the "Policy").

14   (RSUF No. 27.)  The Policy covered the period from October 1, 2009 to October 1, 2010.

15   (RSUF No. 30.)  The insuring language of the Policy provides coverage for an "Insured event,"

16   which, as relevant to the parties' motions, is defined to include an "accidental contamination."

17   (RSUF No. 32.)  An accidental contamination is defined as:

18          "any accidental or unintentional contamination, impairment or mislabeling of an
        *Insured product(s),* which occurs during or as a result of its production,
19        preparation, manufacture, packaging or distribution; provided that the use or
        consumption of Insured product(s):
20
21              (I) Has resulted in or would result in clearly identifiable internal or
            external physical symptoms of bodily injury, sickness, disease or death of
22            any person(s) within one hundred and twenty days (120) days following such
            consumption or use."
23
24   (CSUF No. 2.)  (Emphasis added.)  Section 3.6 of the policy defines an "Insured product" as

25          (I) All topical and ingestible products for human consumption or any of their
        ingredients or components, that are identical with or similar to and requiring the
26        same manufacturing processes and infrastructure as products reported to the
        Insurers on the Application on file with the Insurers or by addendum to such
27        Application and which are as Specified Insured product(s) in the Declaration
        AND are
28              a. In production by the Insured or

4

b. Have been manufactured, handled or distributed by the insured or

c. Manufactured by any contract manufacture for the Insured or

d. Are being prepared by the Insured for or are available for sale."

(RSUF No. 36.)  (Emphasis added.)

The parties dispute whether the circumstances of Basic's recall of HVP products, and Ruiz' related recall of its Tornado products, triggers coverage under the Policy.  Catlin argues there is no coverage for the following reasons: (1) because none of the products received by Ruiz tested positive for Salmonella, there is no contamination of an Insured product; (2) "potential contamination" does not constitute an impairment of an Insured product; (3) even if there were a contamination or impairment, such contamination or impairment took place at Basic's facilities, thus, did not occur "during or as a result" of Ruiz' production of Tornados; and (4) because there was no contamination or impairment, consumption of the Tornados could not result in injury, sickness or death.

Ruiz argues that the potential Salmonella contamination of HVP, as well as Basic's subsequent recall of its HVP products, qualifies as both a contamination and an impairment under the terms of the Policy.  Ruiz also argues the language of the Policy does not require the contamination or impairment take place during Ruiz' manufacture of the Tornados.  Lastly, Ruiz argues that because the Tornados were potentially contaminated and otherwise impaired, the potential contamination had the potential to result in injury, sickness or death.

## III.    DISCUSSION

### A.    Legal Standard For Summary Judgment

Fed. R. Civ. P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim."  Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment/ adjudication as a matter of law.  Fed. R. Civ. P. 56( c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/

1  adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a

2  genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International*

3  *Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).  On summary

4  judgment/adjudication, a court must decide whether there is a "genuine issue as to any material

5  fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56 ( c);

6  *Covey v. Hollydale  Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H.*

7  *Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970).

8       To carry its burden of production on summary judgment/adjudication, a moving party

9  "must either produce evidence negating an essential element of the nonmoving party's claim or

10  defense or show that the nonmoving party does not have enough evidence of an essential element

11  to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz*

12  *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "[T]o carry its ultimate burden of

13  persuasion on the motion, the moving party must persuade the court that there is no genuine issue

14  of material fact." *Nissan Fire*, 210 F.3d at 1102.  "As to materiality, the substantive law will

15  identify which facts are material.  Only disputes over facts that might affect the outcome of the

16  suit under the governing law will properly preclude the entry of summary judgment." *Anderson*,

17  477 U.S. at 248, 106 S.Ct. 2505.

18       "If a moving party fails to carry its initial burden of production, the nonmoving party has

19  no obligation to produce anything, even if the nonmoving party would have the ultimate burden

20  of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90

21  S.Ct. 1598.  "If, however, a moving party carries its burden of production, the nonmoving party

22  must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103.  "If the

23  nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the

24  moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

25  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56( c) mandates the

26  entry of summary judgment, after adequate time for discovery and upon motion, against a party

27  who fails to make the showing sufficient to establish the existence of an element essential to that

28

1  party's case, and on which that party will bear the burden of proof at trial.")

2      Both parties move for summary adjudication on the issue of coverage.  Catlin additionally

3  moves for summary adjudication on Plaintiff's bad faith claim and breach of contract claim on

4  the grounds that if there is not coverage, no breach of contract or bad faith occurred.

5  **B.      Principles of Insurance Policy Interpretation**

6      Interpretation of an insurance contract is a question of law for the Court to determine. *See*

7  *Waller v. Truck Ins. Exch., Inc*., 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995).

8  Courts apply basic principles of contract interpretation to insurance policies with the goal of

9  giving effect to the mutual intention of the parties at the time they signed the policy.  *Id.*  In *AIU*

10  *Insurance Co. v. FMC Corp*, 51 Cal.3d 807, 821-22, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990),

11  the California Supreme Court set forth clear guidelines for the interpretation of insurance

12  policies:

> Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage," controls judicial interpretation.[] Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning. []
>
> If there is ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. [] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. []  In the insurance context, we generally resolve ambiguities in favor of coverage. [] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured.[] These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. [] Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage.

24  *AIU Insurance Co. v. FMC Corp*, 51 Cal.3d 807, 821-22, 274 (1990) (citations omitted.)

25      The predicate to interpreting ambiguities in favor of coverage, however, is that the policy

26  be reasonably susceptible to more than one interpretation. Where a policy clearly excludes

27  coverage, courts will not indulge in tortured constructions to divine a theoretical ambiguity in

28                                  7

order to find coverage.  *City of Laguna Beach v. Mead Reinsurance Corp*., 226 Cal.App.3d 822, 830–831 (1990).  An insurer is entitled to limit its coverage to defined risks, and if it does so in clear language, courts will not impose coverage where none was intended.  *National Ins. Underwriters v. Carter,* 17 Cal.3d 380, 386 (1976).  Whether a clause is ambiguous and whether an insured has an objectively reasonable expectation of coverage in light of the insuring language are questions of law.  *Schrillo Co. v. Hartford Accident & Indemnity Co.,* 181 Cal.App.3d 766, 775–776 (1986).

**C.    Coverage Under the Accidental Contamination Plan**

Under a first party "named" or "specific" perils policy, such as the Product Contamination Policy at issue, "the *insured* has the threshold burden of proving that the loss was caused by the specifically-enumerated peril."  *Strubble v. United Servs. Auto. Ass'n.,* 35 Cal. App. 3d 498, 504 (1973); *Central Nat'l. Ins. Co., v. Superior Court,* 2 Cal. App. 4th 926, 932-3 (1992).  Accordingly, Ruiz has the burden to demonstrate that the subject recalls, and the circumstances related thereto, are events within the scope of the basic coverage.

Accordingly, based on the governing language of the Policy, *see supra* Section II.C., Ruiz must establish: (1) Any accidental or unintentional contamination, impairment or mislabeling; (2) of an Insured product; (3) which occurs during or as a result of its production, preparation, manufacture, packaging or distribution; and (4) where use or consumption of the Insured product has resulted, or would result in clearly identifiable internal or external symptoms of bodily injury, sickness, disease or death.

**1.    An Accidental or Unintentional Contamination or Impairment**

**a.    Tornados Were Not Contaminated Under the Policy**

Ruiz argues its Tornados were contaminated within the intended meaning of the Policy for two reasons: (1) the Class One recall qualifies as accidental contamination under the Policy; and (2) deposition testimony confirms that the Policy's language "*would* result in clearly identifiable internal or external physical symptoms of bodily injury" (emphasis added) means a "potential" to cause illness, generally, is sufficient to trigger coverage.

Catlin argues courts have developed a bright line rule requiring objectively verifiable evidence of actual contamination to trigger coverage under a product contamination policy. Catlin additionally argues that Ruiz misconstrues the language of the Policy, as well as the deposition testimony interpreting the Policy.

### i.    A Class One Recall, By Itself, Does Not Qualify As "Contamination" Under the Policy

Recalls generally, even if related to a belief that a product has been contaminated, does not qualify as a contamination under an accidental contamination policy. *See, e.g., The Limited, Inc. v. Cigna Ins. Co.,* 228 F. Supp. 2d 574, 580 (E.D. Pa. 2001) ("The plain language of the Policy and its title indicate that the parties intended to have coverage for only those specific instances of product tampering and accidental contamination, not for product recalls in general or for defective canisters"); *Little Lady Foods, Inc. v. Houston Cas. Co.* 819 F. Supp.2d 759, 762-64 (N.D. Ill. 2011) (Plaintiff's decision to put a product on hold due to a mistaken belief the product was contaminated with a dangerous bacteria, when in fact it was contaminated with a harmless bacteria and there was no potential for injury to consumers, was not covered by accidental contamination policy); *Fresh Express, Inc. v. Beazley Syndicate 2623/623 at Lloyd's, et al.,* 199 Cal. App. 4th 1038, 1053-54 (2011) (recall issued due to E. Coli outbreak potentially resulting from supplier's spinach, where it was later determined the E. Coli outbreak was not attributable to supplier's spinach, was not covered under accidental contamination policy).

Plaintiff does not offer any authority standing for the proposition that a recall, even if based on the belief that a product has been contaminated with a deleterious substance, allows for a finding that a product has been contaminated under the terms of the Policy. Moreover, there is no evidence before the Court that Ruiz' products were *in fact* contaminated with Salmonella. All the products that were in Ruiz' possession, or could have potentially reached Ruiz via Superior, tested negative for Salmonella. (CSUF 7-14.) While there is *potential* for contamination based on the investigative findings at Basic's facility, there is no evidence before the Court that Ruiz' Tornados were *in fact* contaminated with Salmonella.

1   Recalls are "presumably aimed not only at remedying contamination, but preventing it."

2   *Little Lady Foods, Inc. v. Houston Cas. Co.* 819 F. Supp.2d 759, 763 (N.D. Ill. 2011).  The

3   Policy at issue, reasonably interpreted, does not cover losses incurred to prevent contamination.

4   To substantiate a finding of contamination under the Policy, objectively verifiable evidence that a

5   product was *actually* contaminated is required.  A Class One recall of a product's ingredients,

6   alone, is insufficient to constitute "contamination" under the Policy.

7                    **ii.    The Language of the Policy, Coupled With Relevant**

8                           **Deposition Testimony, Does Not Permit A Finding of**

9                           **Contamination**

10   Ruiz argues the clause for accidental contamination is satisfied by the "potential" for

11   contamination because the Policy's phrase "would result . . . in bodily injury" allows for such an

12   interpretation.  Ruiz argues this interpretation was confirmed by Catlin's claim handler, who

13   testified that the "would result in" language of the Policy means that a "potential" to cause illness

14   is sufficient to trigger coverage.  Stated differently, Ruiz argues the Policy's requirement of a

15   contamination with the potential to cause illness should be interpreted as permitting a *potential*

16   *contamination* that would cause illness.  The Policy defines "accidental contamination," in

17   relevant part, as follows:

18                    any accidental or unintentional contamination . . . provided that the
                      use or consumption of Insured product(s): (I) Has resulted in or
19                    would result in clearly identifiable internal or external physical
                      symptoms of bodily injury . . . .
20

21   Ruiz misconstrues the plain language of the Policy and the deposition testimony of

22   Catlin's claim handler.  The phrase "would result" serves to modify the bodily injury requirement

23   only.  The phrase does not modify the requirement that the product be contaminated or impaired.

24   In *Little Lady Foods, Inc. v. Houston Cas. Co.* 819 F. Supp.2d 759 (N.D. Ill. 2011), the court

25   addressed a similar argument.  In *Little Lady Foods*, the Plaintiff put a product on hold due to a

26   mistaken belief the product was contaminated with a dangerous bacteria, when in fact it was

27   contaminated with a harmless bacteria and there was no potential for injury to consumers.  The

28

*Little Lady* policy covered, in pertinent part, "any accidental or unintentional contamination, impairment or mislabeling . . . provided always that the consumption or use of [Little Lady's product has . . . or may likely result, in . . . physical symptoms of bodily injury . . . ." *Little Lady,* 819 F. Supp. at 761.

The plaintiffs in *Little Lady Foods* argued the phrase "may likely result" in harm to consumers permitted a finding that the product need only be potentially contaminated.  The court rejected this argument, stating that "Little Lady is essentially asking the Court to rewrite the policy to require a likelihood that a product is contaminated rather than a likelihood that the contaminant it does contain is dangerous."  *Little Lady,* 819 F. Supp. at 763.  In other words, the court in *Little Lady* determined the language requiring only the "potential" for injury presupposed a contaminant exists.  The "potential" for injury requires that a contaminate exists.

Similar to the Policy at issue here, the "potential" for injury presupposes a contamination or impairment, and it is the contamination or impairment which potentially causes injury.  The potential to cause injury, however, does not alter the requirement of showing that the contamination or impairment is *actually* present.

The deposition testimony offered by Catlin's claim handler does not alter this conclusion.  The claim handler's testimony that "the potential for injury triggers coverage" was not related to the contamination requirement, but rather, the injury requirement:

> So the 'would result is potential, but - but the trigger of coverage is contamination that would or has resulted in.  So if it is - if it hasn't happened, but the - you know, you have to have a contamination present in order for the policy to be triggered.

(Catlin's Ex. 30, Doc. 105, Attach. 19.)  Catlin's claim handler simply rephrased the injury requirement from "would result in" to "potential for injury."  This rephrasing does not alter the requirement for an *actual* contamination.[3]

_____

[3] In any event, the interpretation of the insurance policy is an issue of law and the claims handler's interpretation is irrelevant.

11

b.      **"Impairment" Under the Policy**

The Policy defines an Accidental Contamination as a "contamination [or] *impairment."* (Emphasis added.)  The Policy, however, does not define the term "impairment."  The parties suggest differing interpretations. Ruiz argues the term "impairment" should be attributed an ordinary dictionary meaning, defined as: "to make or cause to become worse; diminish in ability, value, excellence, etc."  Ruiz' position is that the recall was an impairment to the product.  Catlin argues that defining "impairment" in this manner disregards the context of the Policy, and that "impairment" should be defined as "a defect or flaw *in the product itself*."  (Emphasis in original.)  The dispute boils down to whether coverage exists for a product which **potentially** contained a contaminate.

Disagreement over the meaning of a term does not necessarily make it ambiguous; instead, courts should look to the language and context of the entire policy.  *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal.4th 377, 390-91, 33 Cal.Rptr.3d 562, 118 P.3d 589 (2005).  A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.  *Id.* The term could be defined by a dictionary, or attributed a unique definition based on the context of the Policy.  Generally, words are "interpreted in their 'ordinary and popular sense,' unless used by the parties in a technical sense or a special meaning is given to them by usage."  Cal. Civ. Code § 1644; *AIU Insurance Co. v. FMC Corp*, 51 Cal.3d 807, 821-22 (1990).  Here, the parties have not offered evidence of a technical meaning of "impairment" or any special meaning to be given the word impairment by the parties' usage.  Ruiz offers an interpretation that "impairment" includes a recall.

*Black's Law Dictionary* defines the noun "impairment" as: "[t]he fact or state of being damaged, weakened, or diminished."  *Blacks Law Dictionary* 819 (9th ed. 2009).  Similarly, *Black's Law Dictionary* defines the verb to "impair" as: [t]o diminish the value of (property or a property right)."  *Id; See also, The Limited, Inc. v. Cigna Ins. Co.,* 228 F. Supp. 2d 574 (E.D. Pa. 2001) (In an insurance dispute concerning coverage of a product contamination policy, the court referred to *Black's Law Dictionary* in defining the undefined term "adulterate.")  Notably, the

term has been defined in other policies to fit the *Black's Law Dictionary* definition.  For instance, in *Security Nat. Ins. Co. v. GloryBee Foods, Inc.*, 09-cv-1388-HO,  2011 WL 902635 (D. Or., Mar. 15, 2011), the policy defined "Impaired Property" as tangible property . . . that cannot be used or is less useful because . . . [it] is known or thought to be defective, deficient, inadequate or dangerous."

Catlin cites several cases in support of its contention that the recall of the Tornado product is not an "impairment" under the terms of the Policy.  The Court finds *Little Lady Foods, Inc. v. Houston Cas. Co.,* 819 F. Supp.2d 759 (N.D. Ill. 2011) persuasive.  In *Little Lady Foods,* the insured manufactured an uncooked burrito product for sale in convenience stores that tested positive for the presence of *Listeria* genus bacteria.  *Id.* at 761.  Within the genus *Listeria,* there are seven strains of bacteria, only one of which is likely to cause bodily injury (i.e., *Listeria Monocytogens*).  *Id.*  As a precaution, and consistent with the USDA regulations, Little Lady put 57,000 cases of its burrito product on hold pending further testing of the product.  *Id.*

Little Lady then tendered a first party claim under an accidental contamination policy issued by Houston Casualty.  *Id.*  Like the policy at issue here, the *Little Lady* policy provided coverage for "any accidental or unintentional contamination, impairment or mislabeling" of an Insured product, that "may likely result" in bodily injury.  *Id.*  Houston Casualty denied coverage for the claim after finding out that testing on the burrito product showed that it was not contaminated with the harmful strain of Listeria.

The plaintiff insureds in *Little Lady* argued the products were contaminated or impaired because, at the time it placed its products on hold due to positive testing for Listeria generally, the insureds believed it was possible that consumption of their products could result in bodily injury.  *Id.* at 762-63.  Houston Casualty responded that because none of Little Lady's products actually were contaminated with the harmful bacteria, there was no potential for injury.  The court in *Little Lady* agreed with Houston Casualty, holding there was no coverage because it "was neither probable nor possible" that harm to consumers would result from the contamination or impairment, because the bacteria was harmless.  *Id.* at 763.  *Little Lady* refused to "rewrite the

1  policy to require a likelihood that a product is contaminated rather than a likelihood the

2  contaminant it does contain is dangerous." *Id.*

3       Catlin points out that *Little Lady Foods* "disregarded the 'impairment' language of the

4  policy, even though there was a recall of the product at issue in that case, and emphasized the

5  importance of showing that the product was, in fact, contaminated with a food borne pathogen

6  (i.e., positive test results)." (Catlin's Opp., Doc. 101, 13: 23-26.) Catlin also notes that *Little*

7  *Lady* "held that the mere *potential* for harmful contamination . . . was insufficient to trigger

8  coverage under a product contamination policy." (Catlin's Reply, Doc. 109, 7: 14-17.) The

9  court in *Little Lady* found that the product did not contain a harmful strain of Listeria and

10 therefore there was no likelihood the product was contaminated.

11      The Court accepts Catlin's argument that impairment must be to the product itself, and

12 not as a result of the collateral circumstances surrounding the product. Applying *Black's Law*

13 *Dictionary* definition and the reasoning of *Little Lady,* the product itself must be impaired from

14 the contamination of Ruiz' ingredients.  The mere potential contamination of Ruiz' ingredients

15 does not result in an "Insured product" being "damaged, weakened or diminished," and also does

16 not result in a "diminish[ed] value" of the product itself.  A defect or flaw in "the product itself"

17 results from the incorporation of an ingredient that can not be sold to the public, and has been

18 deemed by the FDA to present a "reasonable probability that the use of the product will cause

19 serious, adverse health consequences."  The recall of a ingredient, requiring recall of the

20 Tornados, does not constitute a "defect or flaw in the product itself."  The defective ingredients

21 did not reach Ruiz. The samples tested by Basic, Superior and Ruiz of the HVP incorporated in

22 the Tornados were negative for Salmonella, there was no potential for Salmonella contamination,

23 thus, there was no defect, flaw or impairment in the Tornados. Thus, the FDA's imposition of a

24 recall does not create a defect in the product itself.

25      Applying this definition of "impairment," the Policy does not require coverage. The Court

26 concludes that whether it uses a dictionary definition of "impairment," the definition suggested

27 by Catlin, or a unique definition based on the context of the Policy, Ruiz' Tornados were not

28

14

1  "impaired."

2      In reaching this conclusion, the Court considers the reasonable expectations of the insured

3  and construes the policy as a whole.  Looking to the four corners of the Policy as a whole, the

4  potential of contamination or impairment and recall of a Tornado ingredient does not constitute

5  an "impairment" under the Policy.  *See, Deutche Bank Securities Inc., v. Lexington Drake L.P.,*

6  29 N.Y.S. 2d 240 (N.Y., Nov. 22, 2010) ("The meaning of Impairment, as defined in the

7  Contracts, should be viewed within the four corners of the Contracts, which govern the parties'

8  rights and obligations."); Cal. Civ. Code § 1641 ("the whole of a contract is to be taken together,

9  so as to give effect to every part, if reasonably practicable, each clause helping to interpret the

10  other.") The Policy is a "Product Contamination Insurance Policy" and is not a recall insurance

11  policy.  The Policy covered the product.  Some defect in the product itself is required to trigger

12  coverage. Some taint in the product itself is required to trigger coverage.  The "potential" of a

13  defect in product does not "impair" the product itself.  Any interpretation of "impairment" to

14  incorporate a "recall," without a concomitant taint in the product, is a strained and unreasonable

15  interpretation.

16      In the context of an insurance policy intended to cover accidentally contaminated

17  products, it was not reasonable for Ruiz to expect coverage for a recall of its product when there

18  was no showing that the product itself incorporated the tainted ingredient.  *AIU Insurance Co. v.*

19  *FMC Corp*, 51 Cal.3d 807, 821-22, 274 (1990) ("we generally interpret the coverage clauses of

20  insurance policies broadly, protecting the objectively reasonable expectations of the insured.[]

21  These rules stem from the fact that the insurer typically drafts policy language, leaving the

22  insured little or no meaningful opportunity or ability to bargain for modifications. [] Because the

23  insurer writes the policy, it is held "responsible" for ambiguous policy language, which is

24  therefore construed in favor of coverage.") (citations omitted.) The "potential" for contamination

25  is insufficient to trigger the policy language "any accidental or unintentional contamination,

26  impairment or mislabeling of an Insured product(s)." As in *Little Lady*, this Court will not

27  rewrite the policy to require coverage for a likelihood that a product is contaminated.

28

Other Policy provisions reenforce this interpretation. For example, the Policy excludes from coverage conduct which may cause injury to the product itself. Exclusion 4.6 precludes coverage of losses arising out of "[i]ntentional violation by the insured of any governmental regulation in connection with the manufacture, sale or distribution of any Insured product(s) or from the use of materials or substances in the manufacturing process which have been banned or declared unsafe by any government entity." (Doc. 99, Attach. 1: 15-16.)  This exclusion indicates an intent to ensure the sanctity of the manufacturing process and protect the Insured's product.  Exclusion 4.13 precludes coverage of losses arising out of "Accidental Contamination that occurs after its Insured has actual or constructive knowledge of a defect or deviation in the product, preparation or manufacture of Insured product(s) or circumstance(s) which have resulted or are likely to result in such deviation or defect and fails to take effective corrective action." *Id.* Thus, the Policy excludes coverage where ingredients used in an Insured's products are defective or have been declared unsafe by any governmental entity.  These provisions manifest the intent of the parties to ensure the product itself remained defect-free, taint-free and/or contamination-free.

Plaintiff argues that it is not attempting to rewrite the policy so that a recall will trigger the policy.  Plaintiff argues that the policy is triggered by evidence that its product is potentially harmful if consumed.  (Doc. 113 p.7.)  This arguments begs the "impairment" question. Plaintiff's argument focuses on whether *if* the product had been tainted, would there be the potential to cause illness.  In this case, the parties agree that *if* the product had been tainted by Salmonella, there would be the potential for injury.  However, whether in fact the product was tainted by Salmonella is a separate question. As stated previously, the circumstances surrounding recall of the product do not "impair" the product where there is no showing the product itself was tainted.

Plaintiff argues that Catlin creates a bright line rule - the only trigger of coverage for the policy is a positive test result of the existence of Salmonella.  (Doc. 113, p. 2, 7.) The Court, however, will not speculate as to the array of circumstances which might provide coverage pursuant to the language in the policy. *Little Lady* is persuasive because while the parties here

agree that Salmonella *is* potentially harmful if ingested, there is no evidence that the Tornados were *actually* tainted by Salmonella.  A *potential* of a defect in the product is insufficient. The mere possibility that a product may contain a contaminate does not trigger coverage.  Where actual contamination has been proved, courts tend to find coverage. *See e.g., Security National Insurance Co. v. GloryBee Foods Inc.*, 2011 WL 902635 (D. Or.,Mar. 15, 2011) (finding coverage where there was actual damage when contaminated peanuts ended up in the policyholder's food product); *contrast Caudill Seed & Warehouse Co. v. Houston Casualty Co.*, 835 F. Supp.2d 329 (W.D. Ky. 2011) (the court held that coverage did not apply because the company merely had used contaminated peanuts in its products -- it had not caused the contamination through its own manufacturing process); *Fresh Express, Inc. v. Beazly Syndicate 2623/623 at Lloyd's, et al.,* 199 Cal. App. 4th 1039 (2011) ("While 'the E. coli outbreak' itself may have given Fresh Express cause to believe that its products were contaminated, 'the E. coli outbreak' was not an '[e]rror by [Fresh Express]' so it could not qualify as 'accidental contamination' and thereby [is not covered as] an 'Insured Event' under the policy.").

Accordingly, this Court holds as a matter of law that Ruiz' Tornados were not "Impaired" within the meaning of the Policy.  As Ruiz' Tornados were not "contaminated, impaired, or mislabeled" under the Policy, the Court grants Catlin's motion for summary adjudication on Ruiz' third cause of action for declaratory relief.  Additionally, because Ruiz' first claim for relief for breach of contract is entirely predicated on the issue of coverage, the Court also grants Catlin's motion for summary adjudication on Ruiz' first claim for relief.

### 2.    "Manufacturing" The Defect Under the Policy

While the Court has found that coverage is not triggered, and therefore Catlin will be granted summary judgment, the Court will address the parties' next two arguments for purposes of a complete record.

The second requirement of Catlin Policy is that the contamination, impairment or

mislabeling of an Insured product[4] occur "during or as a result of its production, preparation, manufacturing, packaging or distribution." Catlin argues this requirement is not met because "[t]he only contamination here occurred at the 'source' supplier, Basic." (Catlin's MSJ, Doc. 96, 15: 21-23.) In other words, Catlin argues the Policy does not cover contaminations or impairments that occur "during or as a result of its production, preparation, manufacturing, packaging or distribution" of *Ruiz' suppliers*. Rather, the Policy only covers manufacturing or production impairments occurring at Ruiz' facility.

In support of this argument, Catlin directs the Court to a recent case from the Western District of Kentucky addressing a substantially similar issue, *Caudill Seed & Warehouse Co., v. Houston Cas. Co.,* 835 F. Supp.2d 329 (W.D. Ky. 2011). In *Caudill Seed,* the insured purchased raw peanuts from several suppliers, one of which was responsible for a Salmonella outbreak. Caudill was advised by the FDA that the FDA considered Caudill's products that used that "source" supplier's peanuts to "have posed an acute, life-threatening hazard to health," and approved a recall of those products. *Id.* Caudill Seed tendered a claim under its accidental and contamination policy, which covered the following situation:

> any accidental or unintentional contamination, impairment or mislabeling (including mislabeling of instructions for use) during the manufacture, blending, mixing, compounding, packaging, labeling, preparation, production or processing (or storage on the premises of the Named Insured), of the Named Insured's Products (including their ingredients or components).

*Id.* at 333. The policy involved in *Caudill* was nearly identical to the policy at issue here. *Id.* at 333.

In *Caudill,* the parties initially disputed whether there was a requirement for Caudill to demonstrate the peanuts were actually contaminated, however, the case turned on Houston's argument that the policy did not cover the recall because "there was no actual contamination or impairment *during* the manufacturing process . . ." *Id.* at 335. Houston Casualty argued that the policy provided coverage only when the product became flawed during the insured's

---

[4] The parties do not dispute that Basic's HVP is an "Insured product" within the meaning of the Policy.

1  manufacturing process, not that of one its suppliers.  *Id.*

2      The *Caudill* court agreed, and found that the subject policy required the contamination or

3  impairment must have taken place during the insured's manufacturing.  *Id.* at 335-36.  The Court

4  declined to find coverage, holding that the accidental contamination policy required the

5  contamination or impairment take place during the insured's manufacturing, and not in instances

6  where the genesis of the defect was with the supplier:

7          After reviewing the language of the Policy, the Court finds that the Peanut Claim
           is not covered. The Court agrees that the impairment of the peanuts did not occur
8          "during the manufacture, blending, mixing, compounding, packaging, labeling,
           preparation, production or processing of the Named Insured's PRODUCTS[.]"
9          Insurance Policy, 5 (emphasis added). The FDA found that the source of the
           outbreak came from peanuts produced by PCA at a plant in Blakely, Georgia.
10         (Pl.'s Mot. Summ. J. 2 [DN 40].) PCA was required by the FDA to recall many of
           its products and notified Plaintiff of the contamination. ( Id. at 3.) While Plaintiff
11         was also directed by the FDA to recall its own products, the source of the
           contamination or impairment did not occur at Plaintiff's facilities. The peanuts
12         were contaminated or impaired prior to Plaintiff obtaining them.

13      *Id.* at 335-36.

14      This Court disagrees with the *Caudill* analysis because it did not consider the policy

15  language of "ingredients." The crux of *Caudill's* finding was that "the source of the

16  contamination or impairment did not occur at Plaintiff's facilities." *Id.* at 336.  The language of

17  the *Caudill* policy, however did not refer to Caudill's facility, but referred to the  "manufacture,

18  blending, mixing, compounding, packaging, labeling, preparation, production or processing . . .

19  of the Named Insured's Products," which included Caudill's ingredients.  *Id.* at 333.

20      *Caudill* conflated the two separate manufacturing contaminations or impairments.  The

21  first contamination or impairment took place when Caudill's peanut supplier encountered an

22  outbreak of salmonella in its processing plant.  The second contamination or impairment

23  occurred when Caudill incorporated the supplier's impaired peanut product into its final product.

24  Prior to Caudill's incorporation of the tainted peanut product into its final product, there was no

25  impairment in the product.  Thus, the "contamination or impairment" of Caudill's final product

26  took place "during the manufacture, blending, mixing, compounding, packaging, labeling,

27  preparation, production or processing . . . of the Named Insured's Products."  The *Caudill* policy

28

did not require the genesis of the contamination take place during Caudill's manufacture of its

final product.

Further, *Caudill* did not address the phrase "including their ingredients or components,"

which served to expand the breadth of the "Named Insured Products."  Rather, *Caudill* concluded

the phrase "during the manufacture" necessarily required the impairment to take place during

Caudill's manufacture of the product at its facility.  "Named Insured Products," however, was

defined to include ingredients and components.  Accordingly, the terms of the *Caudill* policy

covered instances where the insured incorporated a contaminated ingredient or component that

became contaminated during the ingredients' "manufacture, blending, mixing, compounding,

packaging, labeling, preparation, production or processing."  Thus, the Court does not find the

*Caudill* decision persuasive.

Here, the Policy covers "any accidental or unintentional contamination [or] impairment . .

. of an Insured product(s) [defined as including ingredients or components], which occurs during

or as a result of *its* production, preparation, manufacture, packaging or distribution."  (Emphasis

added.)   The Court emphasizes the importance of the word "its" because use of the indefinite

article "its" does not limit coverage to manufacture of Ruiz' final product.  Rather, because

"Insured product(s)" are defined to include ingredients or components, the Policy specifically

covers contaminations or impairments resulting from the "ingredient's" manufacture or

production.  Therefore, the Court does not interpret the Policy as limiting coverage to

manufacturing occurring only at the Ruiz' facility.

**3.       The Impairment Could Have Potentially Resulted In Harm**

The final requirement to trigger coverage under the Policy is that "use or consumption of

Insured product(s) . . . [h]as resulted in or *would result* in clearly identifiable internal or external

physical symptoms of bodily injury, sickness, disease or death of any person(s) . . . following

such consumption or use." (Emphasis added.)  The parties agree, and the evidence demonstrates,

that the language "would result" means that a contamination or impairment has the "potential" to

1  cause injury.[5]  *See, e.g.,* Deposition of Gytis Gavelis, Catlin's Ex. 30, Doc. 105, Attach. 19 ("So

2  the 'would result' is potential . . .")

3       Catlin argues that there is no "potential" for injury because there was no "contamination

4  or impairment."  Catlin argues that the sample testing conducted by Basic, Superior and Ruiz, all

5  of which yielded negative results for Salmonella, support its position that "[t]here is no coverage

6  under the Catlin policy because people cannot - by definition - contract Salmonella poisoning

7  where the product does not contain Salmonella."  (Catlin Opp. Doc. 101, 26: 11-13.)  In support

8  of this argument, Catlin refers this Court to *Little Lady Foods, Inc. v. Houston Cas. Co.,* 819 F.

9  Supp.2d 759 (N.D. Ill. 2011), which based its holding on the fact that it was "was neither

10  probable nor possible" that harm to consumers would result from the contamination or

11  impairment, because the bacteria was harmless.  *Id.* at 763.

12       There is no dispute that had plaintiff shown that the product was tainted or contaminated,

13  that consumption "would result in" injury.  The parties agree that Salmonella *is* potentially

14  harmful if ingested.  Accordingly, the Court finds that the impairment, had it occurred in the

15  product, had the potential to cause injury.

16  **C.    Ruiz' Second Cause of Action For Bad Faith**

17       Catlin seeks summary adjudication on Ruiz' second cause of action for breach of the

18  covenant of good faith and fair dealing ("Bad Faith").  Catlin argues that Ruiz' Bad Faith claim

19  fails as a matter of law because an Insured Event has not taken place, thus no obligation to cover

20  Ruiz' claim, there can be no claim for bad faith.  Ruiz makes three arguments in opposing

21  Catlin's motion for summary adjudication on Ruiz' Bad Faith claim: (1) Catlin did not conduct a

22

23  ─────────────────

24       [5] At oral argument and in the briefing, the parties agreed that the potential to cause injury is sufficient to
   trigger coverage. The following hypothetical provided by Catlin illustrates that only "potential" for harm , rather than

25  actual harm resulting from actual consumption, is required under this provision of the Policy: "Assume Basic's
   contaminated lot of HVP . . . was sent to Superior . . . .  Then assume that Superior used the contaminated lot of

26  HVP to make its beef bullion which Ruiz incorporated into its Tornados.  Further assume Ruiz' contaminated
   Tornados were identified and recalled before they ever reached consumers.  In this scenario the Tornados were, in

27  fact, contaminated, and they had the 'potential to inflict harm' such that their use 'would result in' bodily injury.
   Under this hypothetical scenario, this type of claim may be covered."  (Catlin's Opp., Doc. 101, 21: 1-7.)  (Emphasis

28  omitted.)

reasonable investigation; (2) Catlin unreasonably delayed in handling the claim; and (3) Catlin's continued refusal to accept coverage is evidence of bad faith.

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing," which "requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits." *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 720 (2007); *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 818 (1979). "When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." *Wilson*, 42 Cal.4th at 720. However, "bad faith" implies the notion of conscious unfair dealings, and mere negligence or mistaken judgment is insufficient. *Nieto v. Blue Shield of Cal. Life & Health Ins. Co.*, 181 Cal.App.4th 60, 86 (2010); *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, 90 Cal. App.4th 335, 345 (2001).

There are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Progressive West Ins. Co. v. Superior Court*, 135 Cal.App.4th 263, 278 (2005); *Love v. Fire Ins. Exch.*, 221 Cal. App.3d 1136, 1151 (1990). The "ultimate test" in bad faith liability claims is whether the insurer's denial/conduct was unreasonable. *See Nieto*, 181 Cal.App.4th at 86.

Here, Ruiz can not meet the first requirement of its bad faith claim, namely, that "benefits *due* under the policy [were] withheld." Under California law, in order to assert a claim for bad faith, Plaintiff must have suffered a loss that is covered under the Policy. *Jordan v. Allstate Ins., Co.,* 148 Cal. App. 4th 1062 (2007) ("Before Jordan can successfully assert her claim for damages arising from Allstate's alleged bad faith claims handling activities, she must first demonstrate that there is in fact coverage under the policy"). If there is no coverage, any failure by Catlin to conduct a reasonable investigation or timely tender payments would not have caused Ruiz any damage. *See, Id; see also, Waller v. Truck Ins. Exchange, Inc.,* 11 Cal. 4th 1 (1995) ("there can be no action for breach of the implied covenant of good faith and fair dealing" when "there is no potential for coverage"). As there is no coverage, there can be no claim for bad faith.

1

**IV.    CONCLUSION**

2

     For the foregoing reasons, the Court GRANTS defendant Catlin's motion for summary

3

judgment in its entirety.  The Clerk of the Court is instructed to enter judgment in favor of Catlin

4

Syndicated Limited, sued as Certain Underwriters at Lloyd's of London, and against Ruiz Food

5

Products, Inc.  The Clerk is instructed to close this case.

6

     IT IS SO ORDERED.

7

**Dated:   September 13, 2012**          **/s/ Barbara A. McAuliffe**

8

                                      UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28